HOLLY S. HANOVER, Esq.
California State Bar Number 177303
1016 La Mesa Ave.
Spring Valley, CA 91977
Telephone: (619) 295-1264
E-Mail: Netlawyr@aol.com
Attorney for Defendant, Denise Pelayo-Hernandez

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
### (THE HON. WILLIAM Q. HAYES)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>    Plaintiff, )<br> )<br> )<br>v. )<br> )<br> )<br> )<br>DENISE PELAYO HERNANDEZ (3), )<br>    Defendant. )<br>_____ ) | CASE NO. 08cr0972-WQH<br><br>DATE: May 19, 2008<br>TIME: 2:00 p.m.<br><br>STATEMENT OF FACTS AND<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT<br>OF DEFENDANT'S MOTION |

**I.**

### STATEMENT OF FACTS

The following statement of facts is based, in part, on the indictment, the complaint and initial statement of facts and other information provided by the United States Attorney's office. Counsel received approximately 135 pages of discovery on April 29, 2008. The facts set forth in these motions are subject to amplification and/or modification at the time these motions are heard and are not adopted by the defense.

On or about March 25, 2008, at approximately 9:57 p.m., Border Patrol Agent D. Hill was patrolling in the Boulevard, CA area driving southbound on Robbonwood Road. He observed a white Ford F-150 truck travelling Northbound. He claims it appeared "heavily ladened" and that it "bounced excessively", so he decided to follow the truck as it entered into the Westbound side of Interstate 8. He called in for a

1  stolen vehicle, and was told it was not stolen, but a release of

2  liability ha been registered.  He claims the vehicle was travelling

3  slower than the posted limit and slower than the "flow of traffic".  As

4  agent hill drove up to the truck, he saw a silver tarp covering the bed

5  of the truck, he saw the driver (later identified as Ramon Vasquez

6  Cabrales) continue to look straight ahead, and then the truck exited I-8

7  at Buckman Springs road, before the checkpoint.

8      Agent Hill followed the truck off the freeway and was joined by an

9  unmarked vehicle, driven by agent W. Western, joined agent hill in

10 following the F-150 Southbound on Buckman Springs Road.  Approximately

11 150 yards later, the truck pulled into a driveway with a locked gate.

12 Agents pulled in behind it, and identified themselves.  Agents removed

13 the driver, and 9 other individuals from the truck.

14     Approximately 1 hour later, at 11:00 p.m., border patrol agent A.

15 Pearson was assigned to the checkpoint located on Highway 94 in Jamul,

16 California.  At the primary inspection area, a gold Dodge Intrepid

17 approched his position.  It was driving by Bernice Pelayo Hernandez and

18 Denise Pelayo Hernandez was a passenger in that vehicle.  When asked

19 about their citizenship, both replied they were U.S. citizens.  Agent

20 Pearson asked for some identification, and the driver, Bernice Pelayo

21 Hernandez stated that she did not have any identification, so Agent

22 Pearson sent her to secondary inspection for further checks.

23     Bernice was questioned in the secondary inspection area, and at

24 first she said she had been in Mexico, but then when confronted with the

25 fact that reports indicated that her vehicle had not crossed the border

26 in the past 72 hours, she gave several inculpatory detailed statements

27 about herself and her sister acting as scouts.  Part of the statement

28 included Bernice stating that she had called a friend named "Ramon or

1  Eduardo", and that she believed he would be driving a pick-up truck.
2  Bernice's purse was seized and contained documents which related to the
3  Ford F-150, including receipts for hamburgers found in the truck, and
4  ownership documents.

5      As a result of the statements made by Bernice Pelayo Hernandez,
6  both she and Denise Pelayo Hernandez were placed under arrest in
7  connection with the aliens seized in the F-150.  After this time, both
8  women were held for several hours and then "officially" questioned.
9  Bernice Pelayo Hernandez was questioned at 3:20 a.m. and Denise was
10  questioned at 3:33 a.m.  Unlike the prior questioning of Bernice, this
11  questioning session was preceding by giving them Miranda warnings.  Both
12  women gave inculpatory statements during this questioning period.

13      Both Bernice and Denise Pelayo are out on bond while the case
14  proceeds.

15                              **II.**

16  **THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE DISCOVERY**

17      Denise Pelayo Hernandez makes the following discovery motion
18  pursuant to Rule 12(b)(4) and Rule 16.  This request is not limited to
19  those items that the prosecutor has actual knowledge of, but rather
20  includes all discovery listed below that is "in the possession, custody,
21  or control of any federal agency participating in the same investigation
22  of the defendant."  United States v. Bryan, 868 F.2d 1032, 1036 (9th
23  Cir.), cert. denied, 493 U.S. 858 (1989).

24      *Ms. Pelayo Hernandez may eventually also request a detailed list*
25  *of specific items that may not yet have been produced, and is requesting*
26  *that the government turn over and allow her counsel to view and inspect*
27  *all items at the earliest possible date.  She also specifically requests*
28  *that the government retain, preserve and prevent from destruction, all*

*evidence seized in this case (Including the weapons and ammunition) so that counsel may have the opportunity to re-test it and have it's own expert examine it if necessary.*

(1) <u>Ms. Pelayo Hernandez' Statements</u>. The government must disclose: (1) copies of any written or recorded statements made by Ms. Pelayo Hernandez; (2) copies of any written record containing the substance of any statements made by Ms. Pelayo Hernandez; and (3) the substance of any statements made by Ms. Pelayo Hernandez which the government intends to use, for any purpose, at trial. **This includes any hand-written notes made by agents and any co-conspirator's or material witness alleged statements as well, as well as any video or audio recorded statements**. <u>See</u> Fed. R. Crim. P. 16(a)(1)(A). Ms. Pelayo Hernandez also specifically requests that the circumstances surrounding any alleged waiver of his right to counsel and right to remain silent be disclosed as well.

<u>Statements of Others</u>; the defense moves for an order directing the government to permit the defense to inspect and copy any statements of any co-defendant or co-conspirator, material witness, or confidential informant that the government intends to offer against defendant under Fed. R. Evid. 801(d)(2)(E), including, but not limited to:

    (A)    Relevant written or recorded statements made by any co-defendant or claimed co-conspirator, indicted or unindicted, that are in the government's possession, custody, or control, or that through due diligence may become known to the government; and

    (B)    The substance of any oral statement that the government intends to offer in evidence at the trial of this matter made by any co-defendant or claimed co-conspirator, indicted or unindicted, before or after arrest, in response to interrogation by any person known to the declarant to be a government agent.

(2) <u>Ms. Pelayo Hernandez's Prior Record</u>. Ms. Pelayo Hernandez

4

requests complete disclosure of his prior record if one exists. <u>See</u> Fed. R. Crim. P. 16(a)(1)(B).

(3) <u>Documents and Tangible Objects</u>. Ms. Pelayo Hernandez requests the opportunity to inspect, copy, and photograph all documents and tangible objects which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to her. <u>See</u> Fed. R. Crim. P. 16(a)(1)(C).

(4) <u>Reports of Scientific Tests or Examinations</u>. Ms. Pelayo Hernandez requests the reports of all tests and examinations which are material to the preparation of the defense or are intended for use by the government at trial. <u>See</u> Fed. R. Crim. P. 16(a)(1)(D). Ms. Pelayo Hernandez notes that no fingerprint analyses have been produced. If such analyses exist, Ms. Pelayo Hernandez requests a copy.

(5) <u>Expert Witnesses</u>. Ms. Pelayo Hernandez requests the name and qualifications of any person that the government intends to call as an expert witness. <u>See</u> Fed. R. Crim. P. 16(a)(1)(E). Ms. Pelayo Hernandez requests written summaries describing the bases and reasons for the expert's opinions. <u>See id.</u> This request applies to any fingerprint and handwriting experts that the government intends to call.

(6) <u>Brady Material</u>. Ms. Pelayo Hernandez requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt or punishment. <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Williams v. Taylor</u>, 120 S.Ct. 1479 (2000), <u>Strickler v. Greene</u>, 527 U.S. 263 (1999).

Impeachment evidence falls within the definition of evidence favorable to the accused, and therefore Ms. Pelayo Hernandez requests disclosure of any impeachment evidence concerning any of the government's potential witnesses, including prior convictions and other

evidence of criminal conduct. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).

In addition, Ms. Pelayo Hernandez requests any evidence tending to show that a prospective government witness: (I) is biased or prejudiced against the defendant; (ii) has a motive to falsify or distort his or his testimony; (iii) is unable to perceive, remember, communicate, or tell the truth; or (iv) has used narcotics or other controlled substances, or has been an alcoholic. *This would specifically include any and all reports involving any investigations and grand jury testimony pertaining to the investigating and arresting agents or confidential sources in this case.*

(7) <u>Request for Preservation of Evidence</u>. Ms. Pelayo Hernandez specifically requests the preservation of all physical or documentary evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case.

(8) <u>Any Proposed 404(b) Evidence</u>. "[U]pon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Rule 404(b). Fed. R. Evid. 404(b). Ms. Pelayo Hernandez requests such notice as soon as possible, in order to allow for adequate trial preparation.

(9) <u>Witness Addresses</u>. Ms. Pelayo Hernandez requests the name and last known address of each prospective government witness. She also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a government witness.

08cr0972

(10)    <u>Jencks Act Material</u>.    Ms. Pelayo Hernandez requests production in advance of trial of all material discoverable pursuant to the Jencks Act, 18 U.S.C. § 3500.    This production will avoid needless delays at pretrial hearings and at trial.    **This request includes any "rough" notes taken by the agents in this case**; these notes must be produced pursuant to 18 U.S.C. § 3500(e)(1).    **This request also includes production of transcripts of the testimony of any witness before the grand jury.    Counsel would like access to all witnesses' last known address so an attempt can be made to contact them.**    <u>See</u> 18 U.S.C. § 3500(e)(3).

(11)    <u>Residual Request</u>.    Ms. Pelayo Hernandez intends by this discovery motion to invoke her rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.    Ms. Pelayo Hernandez requests that the government provide her and his attorney with the above-requested material sufficiently in advance of trial.

(12) <u>Government Examination of Law Enforcement Personnel Files</u> Ms. Pelayo Hernandez requests that the government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses.    Ms. Pelayo Hernandez requests that these files be reviewed by the government attorney for evidence of perjurious conduct or other conduct like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).

The obligation to examine files arises by virtue of the defense making a demand for their review:    the Ninth Circuit in <u>Henthorn</u> remanded for <u>in camera</u> review of the agents' files because the

government failed to examine the files of agents who testified at trial. This Court should therefore order the government to review all such files for all testifying witnesses and turn over any material relevant to impeachment or that is exculpatory to Ms. Pelayo Hernandez prior to trial. Ms. Pelayo Hernandez specifically requests that the prosecutor, not the law enforcement officers, review the files in this case. The duty to review the files, under <u>Henthorn</u>, should be the prosecutor's and not the officers'. Only the prosecutor has the legal knowledge and ethical obligations to fully comply with this request.

### III.

**THIS COURT SHOULD PRECLUDE THE PROSECUTION FROM PROCEEDING UNDER AN AIDING AND ABETTING THEORY**

Ms. Pelayo Hernandez moves this Court to preclude the Government from proceeding under an aiding and abetting theory for the following reasons.

**A.   Aiding and Abetting Requires Proof of Specific Intent Beyond the Elements of the Underlying Offense, and the Government's Failure to Allege This Element in the Indictment is a Material Omission.**

The Fifth Amendment requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend. V. Consistent with this Constitutional requirement, the Supreme Court has held that an indictment must "<u>fully, directly, and expressly, without any uncertainty or ambiguity</u>, set forth all the elements necessary to constitute the offense intended to be punished." <u>United States v. Carll</u>, 105 U.S. 611, 612-13 (1881) (emphasis added).

Black letter law holds that an indictment which does not allege an element of an offense, even an implied element, is defective. <u>See, e.g.</u>, <u>Russell v. United States</u>, 369 U.S. 749, 763-64 (1962). "[A]n

indictment's complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." United States v. Velasco-Medina, 305 F.3d 839, 846 (9th Cir. 2002) (quoting United States v. Du Bo, 186 F.3d 1177, 1179 (9th Cir. 1999)); United States v. Keith, 605 F.2d 462, 464 (9th Cir. 1979) ("The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect.").

In the Ninth Circuit, "circuit law is clear that aiding and abetting contains an additional element of specific intent, beyond the mental state required by the principal crime." United States v. Sayetsitty, 107 F.3d 1405, 1412 (9th Cir. 1997).

> The elements necessary to convict an individual under an aiding and abetting theory are (1) *that the accused had the specific intent to facilitate the commission of a crime by another*, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying offense, and (4) that someone committed the underlying substantive offense.

Id. (emphasis in original) (quoting United States v. Gaskins, 849 F.2d 454, 459 (9th Cir. 1988)). "It is the aider and abettor's state of mind, rather than the state of mind of the principal, that determines the former's liability." United States v. Short, 493 F.2d 1170, 1172 (9th Cir. 1974), modified, 500 F.2d 676 (9th Cir. 1974), cert. denied, 419 U.S. 1000 (1974). Given that the Ninth Circuit has held that "the specific intent to facilitate the commission of a crime by another" is an element of aiding and abetting, Gaskins, 849 F.2d at 459, it must be charged in the indictment. "If an element is necessary to convict, it is also necessary to indict, because elements of a crime do not change as criminal proceedings progress." United States v. Hill, 279 F.3d 731,

741 (9th Cir. 2002).

**B.    The Cases Holding that the Aiding and Abetting Theory is Implied in Every Federal Indictment are Not to the Contrary**

It is true that the Ninth Circuit has stated in dictum that aiding and abetting is implied in every indictment.  See United States v. Armstrong, 909 F.2d 1238, 1241 (9th Cir. 1990); United States v. Michaels, 796 F.2d 1112, 1117-1118 (9th Cir. 1986).  However, the Ninth Circuit cases address only challenges to jury instructions, not a challenge to the indictment.  The cases accordingly do not resolve the question presented here.

Because the aiding and abetting statute, 18 U.S.C. § 2, "states a rule of criminal responsibility for acts which one assists another in performing," Nye & Nissen v. United States, 336 U.S. 613, 620 (1949), the acts set forth in the statute merely describe the means of committing an offense.  Armstrong, 909 F.2d at 1243.  See also United States v. Causey, 835 F.2d 1289, 1292 (9th Cir. 1987); Michaels, 796 F.2d at 1117-18.  Put another way, Armstrong and its antecedents do not hold that an indictment may omit the additional intent element required for a conviction under the aiding and abetting theory; they simply recognize that 18 U.S.C. § 2 sets forth the acts of the defendant that expose her to liability as a principal.  Because these cases do not discuss the additional intent element which is necessary to convict a defendant under the aiding and abetting theory, they are inapposite.[1]

**C.    Neither The Prosecution Nor The Court May Broaden The Permissible Bases For Conviction Beyond Those Charged In The Indictment.**

---

[1] If section 2 does not require all offense elements to be alleged in the indictment, then it is unconstitutional.  Congress cannot exempt its statutes from the requirements of the Grand Jury Clause of the Fifth Amendment.  Thus, if this Court holds that section 2 does not require all elements necessary to convict to be alleged in the indictment, then it must strike this statute down.

08cr0972

Requiring the proof to remain true to the indictment enables the grand jury to protect citizens from the unilateral power of the Government to institute criminal prosecutions. United States v. Miller, 471 U.S. 130, 139 (1985).  In accordance with these principles, the United States Supreme Court has observed that

> [i]f it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the constitution says "no person shall be held to answer," may be frittered away until its value is almost destroyed.

Ex parte Bain, 121 U.S. 1, 10 (1962), overruled on other grounds by United States v. Cotton, 535 U.S. 625 (2002).[2]  Accordingly, the Court has held that a district court may not broaden the possible bases for conviction beyond those alleged in the indictment.  Stirone v. United States, 361 U.S. 212, 218  n.3 (1960).

"An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." United States v. Von Stoll, 726 F.2d 584, 586 (9th Cir. 1984).  See also United States v. Cusimano, 148 F.3d 824, 829 (7th Cir. 1998) (recognizing that a court may not constructively amend the indictment through its instructions to the jury); United States v. Dipentino, 242 F.3d 1090, 1094 (9th Cir. 2001) (finding constructive amendment where district court instructed jury on work practice standard not alleged in

---

[2] Cotton did not overrule the cited holding in Bain, nor parallel holdings in Russell or Stirone. Cotton, 535 U.S. at 631.  Indeed, it expressly left this holding of Bain intact.  Id.  Nor did the Court decide whether an indictment error is a structural defect or whether such an error affects substantial rights.  Id. at 631-33.  Thus, it does not aid this Court's analysis.

indictment); <u>United States v. Leichtnam</u>, 948 F.2d 370, 380-81 (7th Cir. 1991) (finding constructive amendment where indictment charged the defendant with using a specific firearm and where the evidence and the district court's instructions "broaden[ed] the possible bases for conviction to include knowingly using or carrying <u>any</u> firearm") (emphasis in original).

Indeed, one court observed that "[w]hat becomes essential to a charged offense in a particular case--that is, above and beyond what is necessary as a statutory matter--depends upon the structure of the indictment . . . and is thus completely within the government's control." <u>United States v. Willoughby</u>, 27 F.3d 263, 266 (7th Cir. 1994) (internal citation omitted); <u>United States v. Weissman</u>, 899 F.2d 1111, 1115 (11th Cir. 1990) (finding constructive amendment and observing that "it must be stressed that the government, through its ability to craft indictments, is the master of the scope of the charged RICO conspiracy . . . . It is the prosecution which sets the parameters to which a RICO conspiracy trial must be confined; having set the stage, the government must be satisfied with the limits of its own creation.") (citations omitted). A constructive amendment always requires reversal because it deprives a defendant of her right to be tried only on the grand jury's charge. <u>Stirone</u>, 361 U.S. at 217; <u>United States v. Floresca</u>, 38 F.3d 706, 713 (4th Cir. 1994) (en banc).

Applying these principles here, if the indictment fails to set forth the additional element of specific intent required to convict a defendant under the aiding and abetting theory, then neither the Government nor this Court can broaden the indictment to include aiding and abetting as a possible basis for conviction.

**D.    The Indictment Here Does Not Authorize The Prosecution To Proceed**

**Under An Aiding And Abetting Theory**.

<u>Sayetsitty</u> clearly holds that to convict a defendant under an aiding and abetting theory, the government must prove at least two different intent elements: the defendant must have specifically intended to aid the principal in the commission of the offense, and the defendant must have the requisite intent for the underlying offense. 107 F.3d at 1412. Aiding and abetting clearly requires proof of an <u>additional</u> intent element beyond the intent required by the statute. <u>Id.</u>

Here, for example, to convict under an aiding-and-abetting theory, the government needs to prove that the defendant intended to aid a principal in the commission of the offense, in addition to proving the intent elements attributed to the principal. These are distinct elements, and under <u>Hill</u>, <u>DuBo</u>, and <u>Pernillo-Fuentes</u>, all of these elements need to be alleged in the indictment. <u>See</u> <u>Du Bo</u>, 186 F.3d at 1179; <u>Pernillo-Fuentes</u>, 252 F.3d at 1032; <u>Hill</u>, 279 F.3d at 741. Because the indictment here failed to allege this additional intent element, this Court may not allow the Government to proceed under an aiding and abetting theory. A contrary holding would constructively amend the indictment and impermissibly broaden the scope of the charges.

**E.    The Indictment's Mere Citation to 18 U.S.C. § 2, the Aiding-and-Abetting Statute, Does Not Render the Indictment Sufficient**.

The Government may argue that even if the intent to aid and abet were required to be alleged in the indictment, the aiding-and-abetting statute was cited in the indictment here. It is true that the indictment cited — without more — 18 U.S.C. § 2. However, this does not render the indictment sufficient.

Ms. Pelayo Hernandez's argument is not that the language, "aiding and abetting," or any of the language set forth in 18 U.S.C. § 2, must

be alleged in the indictment; rather, Ms. Pelayo Hernandez argues that the <u>element</u> recognized by the Ninth Circuit's case law — that the defendant had the specific intent to aid the principal in the commission of the offense — must be alleged in the indictment.

Additionally, the Ninth Circuit's case law cannot be clearer: when the indictment is questioned prior to trial, "[a] correct citation to the statute is not sufficient to compensate for the exclusion [of an essential element]." <u>United States v. Kurka</u>, 818 F.2d 1427, 1431 (9th Cir. 1987) (citing <u>Givens v. Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986); <u>United States v. Rojo</u>, 727 F.2d 1415, 1418-19 (9th Cir. 1983)). <u>Accord</u> <u>United States v. James</u>, 980 F.2d 1314, 1318 (9th Cir. 1992).  In <u>Kurka</u>, the defendant moved to dismiss the indictment on the ground that it failed to allege that the damage to the property was willful.  818 F.2d at 1428.  Even though the indictment cited the correct statute, the Ninth Circuit held that "[t]he failure to include the element of willfulness . . . render[ed] the indictment constitutionally defective," and accordingly reversed the defendant's conviction.  <u>Id.</u> at 1430-31. Likewise, here, mere citation to 18 U.S.C. § 2 does not render the indictment sufficient.

In any event, 18 U.S.C. § 2 does not set forth any offense elements.  <u>See</u> <u>Armstrong</u>, 909 F.2d at 1241.  As a consequence, mere citation to this statute does not reflect that the Grand Jury considered, much less found, the essential element that the Defendant had the specific intent to aid the principal in the commission of the offense.  Thus, citation to 18 U.S.C. § 2 does not cure the deficiency in the indictment.

Thus, this Court should preclude the Government from proceeding under an aiding and abetting theory.

IV.

**THE COURT SHOULD SUPPRESS EVIDENCE SEIZED IN VIOLATION OF DENISE**

**PELAYO HERNANDEZ' RIGHTS**

**A.    This Court Should Suppress Evidence Obtained in Violation of the Fourth Amendment.**

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to seizures of the person and brief investigatory stops of vehicles.  See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).  An officer may not detain a motorist without "a particularized and objective bases for suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-418 (1981).  This "objective basis, or 'reasonable suspicion' must consist of 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'"  United States v. Garcia-Camacho, 53 F.3d 244, 246 (9th Cir. 1995) (citations omitted); accord United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1120 (9th Cir. 2002) (finding that district court erred in finding that vehicle stop was unconstitutional).

In the instant case, the arresting officer did not have reasonable suspicion to stop Denise Pelayo Henandez for any crime, and did not have any basis to question Bernice Pelayo Hernandez for anything other than her citizenship.  Instead, the officer began asking her about how and when she entered the United States - both inquiries would be irrelevant to finding out whether or not an individual was a citizen of the United States.  The agent instead ran a 72 hour lane check to see if Ms. Pelayo's vehicle had crossed into the United States.  Neither this nor any other supposed justification—including Bernice Pelayo's failure to

produce identification was a sufficient reason to send Denise Pelayo to secondary or hold her for any reason.  Because the agents did not have reasonable suspicion to believe that Denise Pelayo committed any offense - until Bernice Pelayo gave incriminating statements in the secondary area (these statements were given in a custodial situation without Miranda Warnings given ahead of time), Denice Pelayo Hernandez' detention was unconstitutional.

**B.    Bernice Pelayo's Lack of Identification Was Not Sufficient Probable Cause to Allow for Inquiry into Other Crimes.**

The Fourth Amendment to the United States Constitution generally proscribes unreasonable searches and seizures.  U.S. Const., amend. IV. Any search or seizure effected without a warrant is per se unreasonable. Katz v. United States, 389 U.S. 347, 357 (1967).  There is no dispute in this case that the stop at the checkpoint was done without the benefit of a warrant.

The instant case implicates the exception for immigration checkpoints, unique procedures maintained by the United States Border Patrol here in Southern California and certain other border regions of the country to aid interdiction of undocumented persons.  The stops effected at the immigration checkpoints at San Clemente and Temecula and the one off of Highway 94 are "seizures" within the meaning of the Fourth Amendment.  United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976).  Nonetheless, they are permissible as warrantless seizures so long as the officials effecting the stops are careful to remain within the bounds of their very narrowly circumscribed authority.  Id. at 567.

In allowing these stops, the Supreme Court was careful to note: "[n]either the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search."  Id. at 558.  Additionally, "[r]eferrals are made for the sole

purpose of conducting a routine and limited inquiry into residence status that cannot feasiblely be made of every motorist where the traffic is heavy." Id. at 560.  The Court emphasized that "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop."  Id. at 566-67 (citing to Terry v. Ohio, 392 U.S. 1, 24-27 (1968), and United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)) (emphasis added).

Once the initial immigration stop ripens into either a full-blown search, an arrest, or some other sort of investigation, the seizure must be supported by either probable cause or consent.  United States v. Ortiz, 422 U.S. 891, 896-97 (1975).  Here, the checkpoint functioned as a pretext to do a records check on both Bernice and Denise Pelayo, and the agents lacked probable cause to search them, and to the best of counsel's knowledge, neither of the women gave any voluntary consent for detention or search.  Thus, this Court must suppress all evidence obtained as a result of the illegal search.  See Wong Sun v. United States, 371 U.S. 471, 484 (1963).

**1.** **The Extended Detention Was a Pretext for Additional Inquiries and Records Checks to attempt to Ferret out Other Crimes.**

Checkpoints used as a pretext to find additional crimes violate the Fourth Amendment.  See City of Indianapolis v. Edmond, 531 U.S. 32, 45 (2000); United States v. Huguenin, 154 F.3d 547, 555 (6th Cir. 1998)(checkpoint unconstitutional where primary purpose was to intercept drugs); United States v. Morales-Zamora, 974 F.2d 149, 153 (10th Cir. 1992)(roadblock stop unconstitutional where evidence showed primary reason was to search for drugs and not to check driver's license); Texas v. Brown, 460 U.S. 730, 743 (1983)(Fourth Amendment violated if "the roadblock was a pretext whereby evidence of narcotics violation might be uncovered in 'plain view' in the course of check for driver's

licenses"); <u>United States v. Soyland</u>, 3 F.3d 1312, 1314-15 (9th Cir. 1993)(Ninth Circuit declines to address issue because it was not properly before the court).

Here, the Border Patrol Agents were clearly trying to find out more than just the legal status of Bernice Pelayo Hernandez.  Instead of running Ms. Pelayo's fingerprints through the database to check on her status, agents began asking about how and when she crossed, and then conducted inquiries about her vehicle - none of which had anything to do with her status as a United States citizen.  Since the purpose of their inquiry was beyond the scope of her citizenship, all evidence seized as a result of that inquiry must be suppressed.

**C.**  **All Statements Given Buy Both Bernice and Denise Pelayo Hernandez Were the Fruits of the Poisonous Tree and Should Be Suppressed.**

All evidence and the fruits of the unconstitutional detention (*e.g.*, statements given by both Denise and Bernice Pelayo, all evidence seized from them and from the F-150 truck) must be suppressed.  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963); <u>see also</u> <u>United States v. Romero-Bustamante</u>, 337 F.3d 1104 (9th Cir. 2003) (finding Fourth Amendment violation, suppressing alien material witnesses, and requiring dismissal of indictment).

**1.  Any Statements Made by Bernice and Denise Pelayo Hernandez Should Be Suppressed**

**a.  The Government Must Demonstrate Compliance With *Miranda*.**

In their reports, agents claim that both women were read their Miranda Rights, but it seems clear from the reports that these warnings were given hours after the initial questioning of Bernice Pelayo.  The only reason that the two women were arrested and later questioned several hours later, was a direct result of the answers that Bernice Pelayo Hernandez gave to officers after she was sent to the secondary

Inspection area.

There is no indication that Bernice Pelayo Hernandez was read her Miranda Rights before the initial questioning in the Secondary area at all. Additionally, counsel could find no written waivers. The questioning of both women hours later, after getting the answers agents needed from the questioning in the secondary area, was done after Bernice Pelayo Hernandez had spoken to agents without being informed of her rights, and the questions after Miranda to both women were a direct result of the answers that agents received from their pre-Miranda questioning.

   **b.   *Miranda* Warnings Must Precede Custodial Interrogation.**

The Supreme Court has held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). The law imposes no substantive duty upon the defendant to make any showing other than that the statement was taken from the defendant during custodial interrogation. Id. at 476.

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Id. at 477; see Orozco v. Texas, 394 U.S. 324, 327 (1969). In Stansbury v. California, the Supreme Court clarified its prior decisions by stating that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. 318, 323 (1994).

The Ninth Circuit has held that a suspect will be found to be in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not freely leave. See United States v. Lee, 699 F.2d 466, 468 (9th Cir. 1982); United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970). In determining whether a person is in custody, a reviewing court must consider the language used to summon the defendant, the physical surroundings of the interrogation, and the extent to which the defendant is confronted with evidence of his guilt. See United States v. Estrada-Lucas, 651 F.2d 1261 (9th Cir. 1980).

Once a person is in custody, Miranda warnings must be given prior to any interrogation. In United States v. Leasure, the Ninth Circuit held that "custody," for the purposes of Miranda warnings, usually begin at the point of secondary inspection in border cases. 122 F.3d 837, 840 (1997). Miranda warnings must advise the defendant of each of his or her "critical" rights. See United States v. Bland, 908 F.2d 471, 473 (9th Cir. 1990). Furthermore, if a defendant indicates that he wishes to remain silent or requests counsel, the interrogation must cease. See Miranda, 384 U.S. at 473-74; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).

In this case, both Bernice and Denise Pelayo were in custody in the secondary inspection area, and they were not free to leave.

### c.    This Court Should Conduct An Evidentiary Hearing.

Right now, agents reports do not give many facts regarding the circumstances of the questioning of Bernice Pelayo Hernandez in the secondary area. If the Court wishes additional inquiry into the factual situation, an evidentiary hearing could shed additional light in the determination about whether or not Bernice Pelayo Hernandez's statements

and the evidence obtained after eliciting those statements should be admitted into evidence.  Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Ms. Pelayo Hernandez are voluntary.  In addition, 18 U.S.C. § 3501(b) requires this Court to consider various enumerated factors, including Ms. Pelayo Hernandez's understanding of her rights and of the charges against her.  Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors.

Moreover, § 3501(a) requires this Court to make a factual determination.  If a factual determination is required, courts must make factual findings by Fed. R. Crim. P. 12.  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Since "`suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

### d.   **There Is No Factual Dispute as to Denise Pelayo Hernandez' Voluntariness, So No Declaration by Her Is Useful or Necessary**

Denise Pelayo Hernandez is not making a traditional statement suppression motion based upon voluntariness in these documents. Instead, she is arguing that the only reason she was questioned in the first place, was because her sister, Bernice Pelayo Hernandez was questioned in a custodial situation without the benefit of Miranda warnings, and the direct result of that questioning, led to the arrest and further questioning of both women.

As such, Denise Pelayo Hernandez' argument is that her statements are the fruit of the poisonous tree, because all evidence obtained after

Bernice Pelayo's statements (including the statements of Denise) was obtained only because of the answers that Bernice Pelayo gave to agents. These answers were given without the benefit of Miranda warnings, and without any probable cause for their inquiry in the first place.

The only reason Bernice and Denise Pelayo Hernandez were sent to the secondary area of the checkpoint, was because Bernice did not have her identification on her.  Inquiry into her status as a United States Citizen, or DMV driving records may have been warranted, but agents went much further than that simple inquiry. Agents questioned Bernice Pelayo about when, where, and how she entered the United States last, and then sought to impeach her by running reports through the border patrol checkpoints to see if she had crossed when she said she had.  No part of that inquiry had anything to do with her status as a United States Citizen or her ability to drive a vehicle in the State of California.

This extended investigation into Bernice Pelayo Hernandez snowballed into Bernice giving agents statements which related to smuggling aliens and scouting for smugglers.  This line of inquiry had nothing to do with why she was sent over to secondary to begin with, nor were any Miranda warnings given to her in the secondary area while she was being questioned.  As a result, without the benefit of Miranda warnings, she gave several detailed incriminating statements about herself and her sister, Denise Pelayo, and this led to their official arrest.  These statement directly led to the detention of both women, and subsequent searches of them and questioning of them.

As such, all evidence obtained after the initial questioning, including the statements given during that questioning, should be suppressed.

1

2                                  **V.**

3          **THE COURT SHOULD GRANT LEAVE TO FILE FURTHER MOTIONS**

4          In order to properly present additional pretrial motions, Ms.

5     Pelayo Hernandez needs more information which may be provided through

6     counsel's discovery request. As more information comes to light and as

7     additional research and/or investigation is completed, additional

8     substantive motions may be necessary. Accordingly, Ms. Pelayo Hernandez

9     requests that the Court permit her to file further motions before trial.

10                                  **VI.**

11                              **CONCLUSION**

12          For the foregoing reasons, Ms. Pelayo Hernandez respectfully

13     requests that the Court grant her motions.

14                                        **Respectfully submitted,**

15

16     **Dated:  April 30, 2008**               s/ *Holly S. Hanover*

17                                            Holly S. Hanover
                                             Attorney for Denise Pelayo Hernandez
                                             E-mail: Netlawyr@aol.com
18

19

20

21

22

23

24

25

26

27

28